IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

WILLIAM W. MOLLETT,                )
                                   )
            Plaintiff,             )
                                   )
      v.                           )   Case No.
                                   )   08-0838-CV-W-REL-SSA
MICHAEL J. ASTRUE, Commissioner    )
of Social Security,                )
                                   )
            Defendant.             )

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff William Mollett seeks review of the final decision
of the Commissioner of Social Security denying plaintiff's
application for disability benefits under Titles II and XVI of
the Social Security Act ("the Act").  Plaintiff argues that the
ALJ erred in failing to contact Grant Piepergerdes, M.D., to
clarify his opinion; in finding that plaintiff could perform his
past relevant work; and in failing to acknowledge the shifting of
the burden at step five of the sequential analysis.  I find that
the substantial evidence in the record as a whole supports the
ALJ's finding that plaintiff is not disabled.  Therefore,
plaintiff's motion for summary judgment will be denied and the
decision of the Commissioner will be affirmed.

## I. BACKGROUND

On September 19, 2005, plaintiff applied for disability
benefits alleging that he had been disabled since November 15,
2004.  Plaintiff's disability stems from memory and coordination

problems.  Plaintiff's application was denied on December 19, 2005.  On April 3, 2008, a hearing was held before an Administrative Law Judge.  On May 20, 2008, the ALJ found that plaintiff was not under a "disability" as defined in the Act.  On September 17, 2008, the Appeals Council denied plaintiff's request for review.  Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II.  *STANDARD FOR JUDICIAL REVIEW*

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner.  The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence.  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996).  The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision.  Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989).  "The Court must also take into consideration the weight of the evidence in the record and apply

a balancing test to evidence which is contradictory." <u>Wilcutts</u>
<u>v. Apfel</u>, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing <u>Steadman v.</u>
<u>Securities & Exchange Commission</u>, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It
means such relevant evidence as a reasonable mind might accept as
adequate to support a conclusion." <u>Richardson v. Perales</u>, 402
U.S. at 401; <u>Jernigan v. Sullivan</u>, 948 F.2d 1070, 1073 n. 5 (8th
Cir. 1991). However, the substantial evidence standard
presupposes a zone of choice within which the decision makers can
go either way, without interference by the courts. "[A]n
administrative decision is not subject to reversal merely because
substantial evidence would have supported an opposite decision."
<u>Id</u>.; <u>Clarke v. Bowen</u>, 843 F.2d 271, 272-73 (8th Cir. 1988).

### III. BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of
proving he is unable to return to past relevant work by reason of
a medically-determinable physical or mental impairment which has
lasted or can be expected to last for a continuous period of not
less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the
plaintiff establishes that he is unable to return to past
relevant work because of the disability, the burden of persuasion
shifts to the Commissioner to establish that there is some other
type of substantial gainful activity in the national economy that

3

the plaintiff can perform.  Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled.  These regulations are codified at 20 C.F.R. §§ 404.1501, et seq.  The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.   Is the claimant performing substantial gainful activity?

> Yes = not disabled.
> No = go to next step.

2.   Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

> No = not disabled.
> Yes = go to next step.

3.   Does the impairment meet or equal a listed impairment in Appendix 1?

> Yes = disabled.
> No = go to next step.

4.   Does the impairment prevent the claimant from doing past relevant work?

> No = not disabled.
> Yes =  go to next step where burden shifts to Commissioner.

4

5.   Does the impairment prevent the claimant from doing any other work?

>           Yes = disabled.
>           No = not disabled.

## IV.   THE RECORD

The record consists of the testimony of plaintiff; his caseworker, Jackie Devine; and vocational expert Marianne Lumpe, in addition to documentary evidence admitted at the hearing.

## A.   EARNINGS RECORD

The record indicates that plaintiff earned the following income from 1971 to 2006:

| Year | Income | Year | Income |
|------|--------|------|--------|
| 1971 | $    307.20 | 1989 | $10,085.04 |
| 1972 | 1,531.00 | 1990 | 2,496.72 |
| 1973 | 2,560.77 | 1991 | 2,674.43 |
| 1974 | 2,933.52 | 1992 | 648.58 |
| 1975 | 2,000.03 | 1993 | 2,413.77 |
| 1976 | 4,407.82 | 1994 | 9,578.71 |
| 1977 | 3,650.43 | 1995 | 11,846.08 |
| 1978 | 5,039.21 | 1996 | 12,669.55 |
| 1979 | 7,549.37 | 1997 | 14,364.65 |
| 1980 | 5,869.17 | 1998 | 13,918.99 |
| 1981 | 7,584.54 | 1999 | 15,434.27 |
| 1982 | 6,383.23 | 2000 | 13,444.01 |
| 1983 | 7,140.72 | 2001 | 5,664.49 |
| 1984 | 15,486.47 | 2002 | 12,261.90 |

5

| 1985 | 17,271.89 | 2003 | 15,209.79 |
|------|-----------|------|-----------|
| 1986 | 17,899.04 | 2004 | 13,464.40 |
| 1987 | 20,009.09 | 2005 | 0.00 |
| 1988 | 7,208.23 | 2006 | 9,276.22[1] |

(Tr. at 59, 68).

In addition, the record includes the earnings from the first three quarters of 2007, which is after plaintiff's alleged onset date (Tr. at 65). Those records reflect earnings of $5,612 for those three quarters.

The record also includes copies of pay stubs from Phoenix Company in 2007 and 2008 showing the hours worked each week at $10 per hour:

December 24, 2007, to December 30, 2007 17.8 hours

December 31, 2007, to January 6, 2008    19.8 hours

January 7, 2008, to January 13, 2008    14.0 hours

January 14, 2008, to January 20, 2008    24.5 hours

January 28, 2008, to February 3, 2008    25.4 hours

February 11, 2008, to February 17, 2008   7.0 hours

February 25, 2008, to March 2, 2008    18.5 hours

March 3, 2008, to March 9, 2008          7.5 hours

October 18, 2008, to October 24, 2008     6.5 hours

(Tr. at 55-58).

_____

[1]This income was earned after plaintiff's alleged onset date.

6

**B.  SUMMARY OF MEDICAL AND ADMINISTRATIVE RECORDS**

A review of the medical records reveals that from January 2004 through September 2004, plaintiff presented to psychiatrist Grant Piepergerdes, M.D., on four occasions for psychological counseling (Tr. at 193-97).  On each occasion, plaintiff reported that he was "doing well," "doing fairly well," or "doing reasonably well" (Tr. at 193-97).  Plaintiff was cooperative, his affect was normal, and he was negative for suicidal or homicidal ideation (Tr. at 193-97).  Dr. Piepergerdes assessed depression, stable on medication, and continued plaintiff's Wellbutrin, an antidepressant (Tr. at 193-97).

Two months before his alleged onset of disability, on September 15, 2004, plaintiff returned to Dr. Piepergerdes for follow up (Tr. at 194).  He reported that his mood had been stable, that he was "doing reasonably well," that he was working as a warehouse worker, and that he had no suicidal or homicidal thoughts (Tr. at 194).  Plaintiff was cooperative and his affect was normal (Tr. at 194).  Dr. Piepergerdes continued plaintiff on Wellbutrin (Tr. at 194).

Plaintiff's alleged onset date is November 15, 2004.

On December 8, 2004, plaintiff returned to Dr. Piepergerdes for a follow up (Tr. at 193).  He reported that he was "doing well," that he was "not depressed," and that he was looking for a

7

new job (Tr. at 193).  Plaintiff was cooperative and had normal
affect (Tr. at 193).  Dr. Piepergerdes continued plaintiff's
Wellbutrin (Tr. at 193).

Three months later, on March 1, 2005, plaintiff completed a
Work Activity Report in connection with his application for
disability benefits (Tr. at 74).  He wrote that he had "worked
steady" as a warehouse worker 40 hours a week from June 15, 2004,
through November 15, 2004 (his alleged onset date) (Tr. at 74).
He also wrote that the only reason he had stopped working was
because he had been laid off due to a lack of tasks to be
completed (Tr. at 74).

On April 6, 2005, plaintiff returned to Dr. Piepergerdes for
a follow up (Tr. at 192).  Plaintiff reported that he was "doing
okay," looking for work, and was "not depressed" (Tr. at 192).
Plaintiff was cooperative with normal affect and no suicidal or
homicidal ideation (Tr. at 192).  Dr. Piepergerdes noted that
plaintiff was stable on his medication.  He continued plaintiff's
Wellbutrin and told plaintiff to start vocational counseling (Tr.
at 192).

On April 10, 2005, plaintiff completed a Function Report
(Tr. at 88-95).  He reported that he lives in a house with
friends, that he has no problems with personal care, and that he
has no difficulty sleeping.  He needs no reminders to take his

8

medicine or to take care of personal needs and grooming.  He
wrote that he is able to do laundry, sweep, vacuum, mow, and do
household repairs.  He works on these tasks for "hours, every
day".  He needs no encouragement or help doing these things.
Plaintiff goes out approximately every other day.  He can drive
or walk, and he can go out alone.  He shops every other day for a
couple of hours.  He is able to pay bills, count change, and use
a checkbook.  He watches television, plays music, and talks to
people on the phone and in person.  He reported that his
condition affects his ability to squat, bend, stand, kneel,
understand, follow instructions, get along with others,
concentrate, and remember.  When asked how long he can pay
attention, he wrote, "Not long at all."  He noted that he
finishes things he starts, but he is "a little slow on
instructions."  He noted that he has been fired in the past from
a job due to problems getting along with people because he does
not like to be told what to do.

      That same day, plaintiff completed a Claimant Questionnaire
Supplement (Tr. at 96).  He reported that he walks for exercise
"every day, a couple of hours".  He sits down "all the time".  If
he stands too long his back hurts.  He can walk "ok".  He can use
his hands ok but he cannot lift or carry for very long.

On May 3, 2005, after reviewing the record, Keith L. Allen, Ph.D., wrote in a Psychiatric Review Technique Form that plaintiff had no restriction in his activities of daily living; no difficulties in maintaining social functioning; and only mild difficulties in maintaining concentration, persistence, or pace (Tr. at 208). It was Dr. Allen's opinion that plaintiff did not have a "severe" mental impairment (Tr. at 198).

The following day, on May 4, 2005, S. Rosamoril, M.D., reviewed the record and found that plaintiff did not have a "severe" physical impairment (Tr. at 211).

On May 17, 2005, Dr. Piepergerdes completed a diagnostic revision (Tr. at 248). He diagnosed major depressive disorder with mild psychosocial and environmental stressors. He assessed plaintiff with a Global Assessment of Functioning ("GAF") score of 68[2] (Tr. at 248).

On July 27, 2005, plaintiff returned to Dr. Piepergerdes for a follow up (Tr. at 247). Plaintiff said he was "not depressed," he was experiencing no side effects from his medication, he was looking for a job, and he had no thoughts of suicide (Tr. at

_____

[2]The GAF Scale is used to report a clinician's opinion as to an individual's level of functioning with regards to psychological, social, and occupational functioning. See Diagnostic and Statistical Manual of Mental Disorders 30 (4th ed. text revised 2000) (DSM-IV-TR). A GAF score of 61-70 indicates some mild symptoms or some difficulty in social, occupational, or school functioning, but otherwise indicates that the individual is generally functioning pretty well. See id. at 32.

247). Plaintiff was cooperative and his affect was normal (Tr. at 247). Dr. Piepergerdes continued plaintiff on Wellbutrin, noting that plaintiff's depression had been stable on medication (Tr. at 247).

On August 24, 2005, plaintiff was seen by Jason Wells, Psy.D., and Kristi Collins-Johns, Psy.D., for A psychological evaluation after having been referred by his vocational rehabilitation counselor (Tr. at 220). Plaintiff reported that he had trouble with balancing and short-term memory due to a motorcycle accident in 1990, but that the only reason he had quit his job as a warehouse helper in May 2004 was he did not like being told by others how to do his job (Tr. at 222). Plaintiff also reported that Wellbutrin was effective at controlling his feelings of depression, and that he had once received SSI but was no longer eligible because he had been working too much (Tr. at 222, 225).

Drs. Wells and Collins-Johns administered the Wechsler Adult Intelligence Scale-Third Edition ("WAIS-III"), the Wechsler Memory Scale-Third Edition ("WMS-III"), the Woodcock-Johnson Test of Achievement-Third Edition ("WJTA-III"), the Boston Naming Test ("BST"), the Trail Making Test ("TMT"), the Booklet Category Test ("BCT"), and the Purdue Pegboard (Tr. at 223-25, 228-31). Results showed plaintiff had average cognitive ability, reading

Case 4:08-cv-00838-REL   Document 11   Filed 11/09/09   Page 11 of 39

ability, mathematical skills, and writing skills; no significant deficits in attention, concentration, memory, or motor functioning; and could understand test instructions and task demands with little to no difficulty (Tr. at 224-25, 232). Drs. Wells and Collins-Johns also administered the Minnesota Multiphasic Personality Inventory-2 ("MMPI-2") (Tr. at 225). Test results showed plaintiff had deliberately attempted to present himself in an unfavorable light, suggesting that he may be blunt in social situations (Tr. at 225). Drs. Wells and Collins-Johns assessed depression and assigned plaintiff a GAF score of 63 (Tr. at 226). Overall, it was their opinion that plaintiff had average intellectual abilities and no difficulties with attention or concentration (Tr. at 223, 226). Portions of the report read as follows:

> In 1990, Mr. Mollett reportedly experienced a motorcycle accident in which, "a girl tried to kill me." No medical records or other supporting documentation were provided. Per his report, he was hospitalized for nine and one-half months following the accident and was in several hospitals. . . . Three and one-half f those months he remained in a coma. Following the accident, he reported experiencing back pain and loss of balance. He reports difficulty with short-term memory although he notices no problems with his long-term memory abilities. . . .
>
> Mr. Mollett dropped out of high school his senior year and joined the Army. Later, he received a GED and completed one and one-half years of college. His employer, Fixtures Furniture, paid for his college education to become a manager. Once he received the promotion, he quit school, stating attending college was no longer necessary. . . . He reported maintaining B's and C's throughout his academic

12

career and denied experiencing any type of difficulty
related to learning.

. . . Mr. Mollett reported having a mental health history.
Although he could not indicate the approximate duration of
receiving treatment, available records indicate he has taken
psychotropic medication for depressive symptoms for
approximately one year. Currently he takes Wellbutrin XL
300 mg daily. He believes the medication is helpful in
alleviating his depression. He was unable to describe the
circumstances leading to the prescription fo the medication.
He did, however, report that the, "state," was paying for
the medication by giving him a voucher to present at
payment. . . .

Regarding substance use Mr. Mollett reported first consuming
alcohol at age 17. He currently drinks four beers
approximately every other day He began using marijuana when
he was a teenager. He now uses it on an occasional basis.
He smokes one-half to one pack of Marlboro cigarettes per
day.

Mr. Mollett is currently unemployed. From December 16,
1993, until May 17, 2004, he was employed at Packaging
Dynamics in Kansas City, Missouri. He was a warehouse
worker assembling displays. He enjoyed his job until the
company began placing too much work on him and "telling him
how to do his job". As a result, he resigned. Vocational
Rehabilitation assisted him with this job placement. Mr.
Mollett currently as a valid forklift license and would be
willing to accept a position within this field of work.
However, he truly desires to receive schooling for a
Commercial Drivers License (CDL) to drive trucks or receive
the appropriate training to work as a massage therapist.
Currently, Mr. Mollett receives food stamps through the
state. He received his last unemployment check in June
2005. He once received Supplemental Security Income (SSI),
however, he is no longer eligible since he is capable of
working. . . .

. . . Mr. Mollett's scores [on the WMS-III] are in the
average range and indicate that his working memory capacity
is comparable to that of others in his age group. His
ability to recall new information after a brief interval is
also in the average classification range. His [sic]
demonstrates an average ability to retrieve recently learned

13

information after a 25-35 minute delay. . . . Overall, Mr.
Mollett's scores on this measure of memory abilities all
fell within the average, or expected range.

Mr. Mollett evidenced no significant deficits on the
specific screening measures of attention and concentration.
. . .

. . . During the [Boston Naming Test], he did not display
any difficulties with respect to speech or auditory
comprehension. He was able to understand test instructions
and task demands with little to no difficulty. . . .

On October 10, 2005, plaintiff completed a Function Report

(Tr. at 116-124). He described his day as follows: "I wake up

get dressed then get ready to go find a job, I keep at it till

later in the day. Then I come home and start reading the

newspaper for the next day." He reported that his condition

affects his sleep in that he now sleeps three to four hours a

day. He has no problems with personal care. His girl friend

must remind him to brush his teeth, take a bath, and shave. He

needs reminders to take his medicine. He could mow his yard for

two to three hours. He was able to drive and goes out every day.

He could pay bills and count change, but he could not use a

checkbook. His hobbies included watching television, reading the

newspaper, playing cards or board games, fishing, going out to

eat, and visiting with family. When asked if he had ever been

fired because of problems getting along with people, he checked

"no".

14

On October 27, 2005, plaintiff returned to Dr. Piepergerdes for a follow up (Tr. at 246). He reported that he was "doing okay" and that he was looking for a job (Tr. at 246). Plaintiff was cooperative with a bright affect (Tr. at 246). Dr. Piepergerdes continued plaintiff on Wellbutrin and told him to follow up in four months (Tr. at 246).

On December 13, 2005, after reviewing the record, J. Scott Morrison, M.D., found that plaintiff had no restriction in activities of daily living; no difficulties with maintaining social functioning; and only mild difficulties in maintaining concentration, persistence, or pace (Tr. at 259). Dr. Morrison noted that plaintiff had told Dr. Piepergerdes that he was "doing okay," and that he had reported on several occasions he was looking for work (Tr. at 261).

On January 26, 2006, plaintiff completed a Daily Activities Questionnaire (Tr. at 134-139). He reported that he is able to do laundry, vacuum, sweep, take out the trash, some home repairs, mow the lawn, rake leaves, go to the post office, do clean the house, crossword puzzles, and put puzzles together. He reported that he gets three to four hours of sleep per day "since my accident. I used to get 8-10 hrs sleep a day before accident." Plaintiff was able to watch a one-hour television show but said

15

he had to get up and walk around because he gets a funny feeling in his legs.

The following day, on January 27, 2006, plaintiff wrote that he had spent the last two weeks working 25 hours per week as a housekeeper (Tr. at 141).

On February 24, 2006, plaintiff returned to Dr. Piepergerdes for a follow up (Tr. at 284). Although he reported that he was having trouble working more than part-time, plaintiff nevertheless admitted that he was "doing okay" (Tr. at 284). Plaintiff was cooperative with normal affect and no suicidal or homicidal ideation (Tr. at 284). Dr. Piepergerdes continued plaintiff on Wellbutrin and told him to follow up in four months (Tr. at 284).

On May 12, 2006, plaintiff told Dr. Piepergerdes that his concentration was poor and that he was having difficulty socializing with others, but he indicated that he was "not depressed" (Tr. at 283). Although his mood appeared constricted, plaintiff was cooperative and negative for violent ideation (Tr. at 283). Dr. Piepergerdes continued plaintiff on Wellbutrin (Tr. at 283).

On June 12, 2006, at the request of plaintiff's counsel, Dr. Piepergerdes completed a Mental Residual Functional Capacity Assessment (Tr. at 263). He found that plaintiff was markedly

16

limited in his ability to maintain attention and concentration for extended periods, perform activities within a schedule, and understand, remember, and carry out detailed instructions. He found that plaintiff was moderately limited in his ability to sustain a routine; complete a normal workday; interact with the general public; get along with coworkers; respond to criticism from supervisors; maintain socially appropriate behavior; remember locations and work-like procedures; make simple work-related decisions; and understand, remember, and carry out simple instructions. He found that plaintiff was not significantly limited in his ability to respond to changes in a work setting, take appropriate precautions around hazards, set realistic goals independently of others, and travel to unfamiliar places or use public transportation (Tr. at 263-64, 281-82). Dr. Piepergerdes also found that plaintiff would have moderate restriction in his activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; and mild repeated episodes of decompensation (Tr. at 266). Overall, it was Dr. Piepergerdes's opinion that plaintiff suffered from depressive syndrome characterized by anhedonia,[3] decreased energy, and difficulty concentrating or thinking; and that he could not

---

[3]The inability to gain pleasure from enjoyable experiences.

"sustain 20 hours per week even in a low skill low stress employment situation" (Tr. at 267, 282).

On June 16, 2006, and July 13, 2006, Steven Taylor, B.S., with Tri-County Mental Health Services (TCMHS), contacted plaintiff to ask him if he would like to be followed by a caseworker (Tr. at 279-80). Plaintiff responded that he would, but that he was working up to 30 hours a week, and that he was not sure when he would be available to meet (Tr. at 279-80).

The following month, on August 11, 2006, Ginger Parker, B.S., C.S.W., contacted plaintiff to ask when he would be available to meet with a caseworker (Tr. at 278). Plaintiff stated that he was currently working from 8:30 a.m. to 5:30 a.m, daily, and that he was not sure a caseworker could help him with anything (Tr. at 278).

The following month, on September 21, 2006, plaintiff told Aubrey M. Turner, B.A., at TCMHS, that he wanted to find a job that required following only simple instructions (Tr. at 277).

On September 26, 2006, plaintiff returned to Dr. Piepergerdes for a follow up (Tr. at 275). Plaintiff reported that he was "doing okay," working part time, and being followed by a social worker (Tr. at 275). Although his affect appeared "somewhat constricted," plaintiff was cooperative and negative for violent ideation (Tr. at 275). Dr. Piepergerdes continued

18

plaintiff's Wellbutrin and told him to continue working with a
social worker (Tr. at 275).

The following month, on October 20, 2006, plaintiff told Ms.
Parker that he wanted to change jobs (Tr. at 274).

Three moths later, on January 15, 2007, plaintiff reported
to Ms. Parker that he was "doing well" and wanted to be seen only
once a month (Tr. at 273).

Two months later, on March 21, 2007, plaintiff told a TCMHS
staff member that he had run out of his medication and that his
short-term memory was "really bad" (Tr. at 271).

On October 19, 2007, plaintiff told a TCMHS staff member
that he had been working for the past one and one-half years
cleaning apartments (Tr. at 292).

On December 21, 2007, plaintiff told Jackie DeVine, M.A., at
TCMHS, that he was has having problems with his short-term memory
(Tr. at 295).

On January 15, 2008, Ms. DeVine noted that plaintiff
continued to work despite reporting a neck injury (Tr. at 296).

On January 23, 2008, plaintiff completed a Disability Report
in connection with his application (Tr. at 104).  He wrote that
he continued to work after his conditions first bothered him, and
that he never had to change jobs or work fewer hours as a result
of his condition (Tr. at 105).  He also wrote that the only

19

reason he stopped working as a warehouse helper in May 2004 was
he did not get along with new employees at the company (Tr. at
105). Finally, plaintiff wrote that he had last worked at a
temporary position until November 15, 2004, but that he had to
quit because the work had ended (Tr. at 105).

On February 6, 2008, plaintiff asked Ms. DeVine for
assistance in completing disability paperwork (Tr. at 285). That
same day, without Ms. DeVine's assistance, plaintiff wrote in a
Medications Questionnaire that he was taking Wellbutrin for his
depression and Tramadol for his back pain, and that he was
experiencing no side effects (Tr. at 164).

Two days later, on February 8, 2008, plaintiff met with Ms.
DeVine to complete additional disability paperwork (Tr. at 286).
He told Ms. DeVine that his depression was "not too bad," and
that he felt hopeful for the future (Tr. at 286). That same day,
plaintiff wrote in a Daily Living Activities Questionnaire that
he lived in a house with his girl friend and her nephew (Tr. at
157-162). He could follow recipes to cook unfamiliar dishes, but
he normally made hamburgers, hot dogs and Hamburger Helper. He
noted that he needed help with laundry, that he spent six to
seven hours cleaning house, he could sweep and do dishes, he
could mow the yard, he could shop for groceries, he could drive
and leave his home without assistance, he could fish, and he

20

worked part time cleaning apartments, although it took him two to three times longer than it should. He also wrote that he could get along with others, and that he enjoyed fishing and visiting with friends and relatives in his free time (Tr. at 160). Finally plaintiff wrote that he was working 25 to 40 hours a week cleaning apartments (Tr. at 157, 160, 165).

## C.    *SUMMARY OF TESTIMONY*

During the April 3, 2008, hearing, the following individuals testified:  plaintiff; his caseworker, Jackie Devine; and vocational expert, Marianne Lumpe.

### 1.    Plaintiff's testimony.

Plaintiff was 52 years of age at the time of the hearing (Tr. at 301). He has an 11th grade education an earned a GED (Tr. at 301). At the time of the hearing, plaintiff was working cleaning apartments part time, about 20 hours per week (Tr. at 301-302). He had been doing that for a couple of years (Tr. at 302). He gets paid $10 per hour for cleaning the club house and the halls, and he gets a flat rate of $25 to $45 for cleaning an apartment, depending on the size[4] (Tr. at 302, 306). Prior to this job, plaintiff collected unemployment benefits for five to six months (Tr. at 302). Before that, he worked for Packaging

---

[4]Plaintiff's check stubs show that he was paid $10 per hour, not a particular amount per job.

21

Dynamics as a warehouseman for ten and one half years (Tr. at
302-303).  He left that job because he got upset about new people
telling him how to do his job (Tr. at 303).

Plaintiff got his current part-time job through the
vocational rehabilitation unit at Tri-County Mental Health (Tr.
at 304).  No one else cleans apartments there but him, unless he
is on vacation (Tr. at 304).  He is able to work at his own pace
(Tr. at 305).  He works slowly because his balance is off and his
lower back hurts (Tr. at 305).  Every now and then, his left leg
"kind of goes numb" (Tr. at 305).  The biggest reason for his
slow work pace is his inability to concentrate (Tr. at 305).
Plaintiff believes his way of doing things is more efficient, but
his supervisor tells him to go a little bit faster (Tr. at 305-
306).  It takes plaintiff about one day to clean a one-bedroom,
one-bathroom apartment (Tr. at 306).  It takes him a day and a
half to two days to clean a two-bedroom, two-bath apartment (Tr.
at 306).  Plaintiff could not do this job full time because he is
unable to remember things (Tr. at 307).  When asked to explain
how his memory interferes with his work, plaintiff testified:

> Like one, one time my boss told me that I didn't clean the
> ceiling fan.  Another time she said I ain't, I didn't clean
> the bathroom tub real good, because it had that sticky stuff
> on the bottom of it, so you don't slip, you know, had that
> and I didn't take them off, out of, off the tub, just
> cleaned over them, and she got onto me about that.

(Tr. at 307).  Plaintiff said his boss had to correct him once or

Case 4:08-cv-00838-REL   Document 11   Filed 11/09/09   Page 22 of 39

twice a week (Tr. at 307).

Plaintiff is not married, but he has seven children (Tr. at 303). He does not know how old they are, but one is married and has three children (Tr. at 304). None of plaintiff's children live with him nor does he see them (Tr. at 304). He thinks they live in Independence or Sugar Creek (Tr. at 309). When asked why he does not see his children, plaintiff said, "I don't know." (Tr. at 309). Plaintiff does not see anyone in his family (Tr. at 309). After his 1990 accident, plaintiff's brother took things from plaintiff, such as plaintiff's El Camino (Tr. at 309). Plaintiff does not visit friends, and no one comes to see him (Tr. at 310).

Plaintiff can drive (Tr. at 304). He goes to the store for his girl friend, but every now and then he gets the wrong things (Tr. at 304). He cleans about two apartments per week (Tr. at 308). When he is not working, he does a little bit of work around the house such as sweeping the floors (Tr. at 308). He watches television during the day, he mows the yard, and his hobbies include fishing (Tr. at 308, 309, 310).

Plaintiff takes medication for his back pain (Tr. at 310). He thinks he got it from the free clinic in Riverside (Tr. at 310). He started going to that clinic the year before the hearing (Tr. at 310).

23

Plaintiff had an accident in 1990 and has been with vocational rehabilitation at Tri-County Mental Health ever since (Tr. at 308-309).

## 2. Caseworker testimony.

Jackie Devine was plaintiff's case manager at Tri-County Mental Health Services (Tr. at 314-315). Ms. Devine had worked with defendant at Tri-County for the past six months (Tr. at 315). She saw him once or twice a month (Tr. at 315). Ms. Devine testified that plaintiff has a case manager because he needs assistance to maintain independent living in the community (Tr. at 315-316). Whenever plaintiff receives a communication and does not understand what he has received, he calls Ms. Devine (Tr. at 316). She helps him fill out forms; and she monitors his mental illness by seeing how he is doing, what his needs are, and whether he is feeling suicidal or homicidal (Tr. at 316).

When plaintiff is in Ms. Devine's office, he moves slowly, and he makes facial expressions and noises that lead her to believe he is in pain (Tr. at 316). She believes his depression manifests itself in his lethargy (Tr. at 316). He always seems to her to be very worried, anxious, and ruminative (Tr. at 317). He has a very hard time answering questions, understanding what is being asked of him, and remembering his history (Tr. at 317).

24

**3.    Vocational expert testimony.**

Vocational expert Marianne Lumpe testified at the request of the Administrative Law Judge.

The first hypothetical involved a person who could perform medium work but was limited to simple, repetitive, unskilled work with only occasional contact with the public and supervisors (Tr. at 312).  The vocational expert testified that such a person could perform plaintiff's past relevant work as a warehouse worker (Tr. at 312).  In addition, the person could perform other jobs such as cleaner, D.O.T. 381.687-018, with 2,000 in the Kansas City area and 4,000 in the State of Missouri (Tr. at 313). The person could also be a landscape specialist, D.O.T. 406.687-010, with 700 in the Kansas City area and 2,500 in the State of Missouri (Tr. at 313).

The second hypothetical, posed by plaintiff's attorney, involved a person who could not keep up the work pace or productivity requirements of any job (Tr. at 314).  The vocational expert testified that such a person could not work (Tr. at 314).

## *V.    FINDINGS OF THE ALJ*

Administrative Law Judge George Bock entered his opinion on May 20, 2008 (Tr. at 16-22).

Case 4:08-cv-00838-REL   Document 11   Filed 11/09/09   Page 25 of 39

Step one.  The ALJ found that plaintiff has not engaged in substantial gainful activity since his alleged onset date (Tr. at 17).

> Claimant testified he has been working part-time, about 20 hours a week, cleaning apartments.  He testified he is paid $10.00 for cleaning the club house and $25.00-$30.00 for cleaning an apartment.  He testified he worked prior to that as a warehouseman but quit because he was upset when a new supervisor told him how to do his job, not because he was unable to do the job and this does not support his allegation of disability.  The undersigned notes claimant's income after his alleged onset date does not rise to the level presumed to represent substantial gainful activity but his current work is evidence of his ability to work. Claimant testified he also received unemployment for about five months which the undersigned finds is inconsistent with disability because an applicant for unemployment compensation must state he is able to work in order to qualify for such benefits.

(Tr. at 17).

Step two.  The ALJ found that plaintiff suffers memory problems and mild psychomotor delay from a motor vehicle accident, which he found to be severe.

> The evidence supports a finding that claimant has the following severe impairment:  status post head injury from a motor vehicle accident in 1999 with resultant memory problems and mild psychomotor delay but with work at the substantial gainful activity for many years thereafter. Claimant has other acute and/or transitory conditions, none of which is found to be severe and thus, not discussed herein including history of recent back strain but there is no evidence supporting ongoing back problems during the period at issue.

(Tr. at 17).

Case 4:08-cv-00838-REL   Document 11   Filed 11/09/09   Page 26 of 39

Step three.  Plaintiff's condition does not meet or equal a
listed impairment including listing 12.04C "because claimant has
not had repeated episodes of decompensation as defined in the
listings, he does not have a residual disease process that would
cause him to decompensate with a minimal increase in mental
demands or change in environment, and he does not have a history
of at least one year's inability to function outside a highly
supportive living arrangement." (Tr. at 17).

Step four.  The ALJ found that plaintiff had the following
mental residual functional capacity:  "none to mild limitation in
activities of daily living; moderate difficulties maintaining
social functioning such that he can only occasionally work with
co-workers and supervisors; moderate difficulties maintaining
concentration, persistence, or pace such that he is limited to
simple, repetitive, unskilled tasks; and no periods of
decompensation of extended duration as defined in the
regulations." (Tr. at 17).  He found that plaintiff had the
physical residual functional capacity to do medium work
physically "but is limited to simple, repetitive, unskilled work
with only occasional contact with the public and supervisors."
(Tr. at 20).  With this residual functional capacity, plaintiff
can return to his past relevant work as a warehouse worker (Tr.
at 21).

Step five.  Alternatively, the ALJ found that plaintiff can perform other work in the economy, such as a cleaner or landscaper (Tr. at 21).

## VI. DUTY OF ALJ

Plaintiff argues that the ALJ erred in failing to contact Dr. Piepergerdes for further information regarding his opinion that plaintiff could not work "more than 20 hours per week, even in a low skill low stress employment situation."

The ALJ discussed at length the treatment records and opinion of Dr. Piepergerdes:

> When claimant was seen at Tri-County Mental Health by Grant
> Piepergerdes, M.D., his treating psychiatrist, on July 27,
> 2005, he was "not depressed", was still looking for a job,
> and his depression was considered stable on medication.
> When seen again on October 27, 2005, he was doing okay and
> was getting help to obtain employment.  Dr. Piepergerdes
> reported claimant was cooperative with a fairly bright
> affect and did not need to return for four months.  Claimant
> was seen again on February 24, 2006 and was noted to be
> having difficulty maintaining more than a part-time job due
> to "concentration and persistence of problems".  When seen
> on May 12, 2006, he was diagnosed with depression and
> history of head injury but claimant did not feel he was
> depressed.  On July 12, 2006, Dr. Piepergerdes completed a
> mental residual functional capacity assessment indicating
> claimant was moderately limited in understanding,
> remembering, and carrying out simple instructions and
> markedly limited with detailed instructions and in
> maintaining concentration for extended periods.  He reported
> claimant was moderately limited in getting along with the
> public, co-workers, and supervisors, and in maintaining
> socially appropriate behavior in a work setting.  That day,
> he also completed a report stating claimant had worked a
> series of full time jobs that ended due to the above
> problems and as such, did not feel claimant could sustain
> more than 20 hours per week, even in a low skill, low stress

28

employment situation. He reported claimant's condition had
significantly worsened since May 2005 but did not know why
and recommended neuropsychological testing.

The record includes an initial statement from claimant's
case worker dated August 11, 2006 at which time claimant
stated he was working from 8:30 a.m. to 5:00 pm. On
September 21, 2006, claimant stated he was a hard worker,
needed simple instructions, and preferred to work alone.

On September 26, 2006, Dr. Piepergerdes reported claimant
was working but could not handle more than part-time.[5] On
January 15, 2007, claimant's case worker contacted him to
see how he was doing and claimant was "doing well". On
October 19, 2007, case worker records show claimant had been
cleaning apartments for 1 1/2 years but "would like to get
on disability again", noting some medical problems,
particularly with his knee. However, there is no evidence
of any treatment for knee pain and he did not indicate any
such problem at the hearing. . . .

. . . The undersigned has considered the mental residual
functional capacity assessment from Dr. Piepergerdes but
gives it little weight because it is not supported by his
own treatment notes that show claimant's condition is fairly
stable since he has not required any adjustment in
medication or treatment. In his report, Dr. Piepergerdes
indicated claimant had worked a series of full time jobs
that ended due to his memory problems and trouble getting
along with people. However, the undersigned notes claimant
worked at one full time job for over 10 years as a
warehouseman and quit because he didn't get along with new
people. He worked at another warehouse job in 2004 from
which he was laid off due to lack of work, not because he
was unable to do the job. Dr. Piepergerdes'[s] opinion is
also inconsistent with comprehensive neuropsychological
testing results, described above and with claimant's daily
activities that include driving, working, maintaining a
relationship with his girlfriend, mowing the lawn, and
occasional household chores. Finally, claimant takes one
mild psychotropic medication, he does not alleged disability
due to trouble interacting socially, and he only has trouble
getting along when others tell him what to do.

_____

[5]This was about a month and a half after plaintiff had
reported that he was working from 8:30 a.m. to 5:00 p.m.

(Tr. at 18-20).

Social Security Ruling 96-5p reads in pertinent part as

follows:

Under 20 CFR 404.1527(e) and 416.927(e), some issues are not
medical issues regarding the nature and severity of an
individual's impairment(s) but are administrative findings
that are dispositive of a case; i.e., that would direct the
determination or decision of disability.  The following are
examples of such issues:

> 1.   Whether an individual's impairment(s) meets
> or is equivalent in severity to the requirements of any
> impairment(s) in the listings;

> 2.   What an individual's RFC is;

> 3.   Whether an individual's RFC prevents him or
> her from doing past relevant work;

> 4.   How the vocational factors of age, education,
> and work experience apply; and

> 5.   Whether an individual is "disabled" under the
> Act.

The regulations provide that the final responsibility for
deciding issues such as these is reserved to the
Commissioner.  Nevertheless, our rules provide that
adjudicators must always carefully consider medical source
opinions about any issue, including opinions about issues
that are reserved to the Commissioner.  For treating
sources, the rules also require that we make every
reasonable effort to recontact such sources for
clarification when they provide opinions on issues reserved
to the Commissioner and the bases for such opinions are not
clear to us.

However, treating source opinions on issues that are
reserved to the Commissioner are never entitled to
controlling weight or special significance. . . .

However, opinions from any medical source on issues reserved
to the Commissioner must never be ignored.  The adjudicator

30

is required to evaluate all evidence in the case record that
may have a bearing on the determination or decision of
disability, including opinions from medical sources about
issues reserved to the Commissioner.  If the case record
contains an opinion from a medical source on an issue
reserved to the Commissioner, the adjudicator must evaluate
all the evidence in the case record to determine the extent
to which the opinion is supported by the record.

                        *  *  *  *  *

*Medical Source Statement*

. . .  Medical source statements are to be based on the
medical sources' records and examination of the individual;
i.e., their personal knowledge of the individual.
Therefore, because there will frequently be medical and
other evidence in the case record that will not be known to
a particular medical source, a medical source statement may
provide an incomplete picture of the individual's abilities.
. . .

*Medical Source Statement vs. RFC Assessment*

. . .  From time-to-time, medical sources may provide
opinions that an individual is limited to "sedentary work,"
"sedentary activity," "light work," or similar statements
that appear to use the terms set out in our regulations and
Rulings to describe exertional levels of maximum sustained
work capability. Adjudicators must not assume that a medical
source using terms such as "sedentary" and "light" is aware
of our definitions of these terms.

        Opinions on Whether an Individual Is Disabled

Medical sources often offer opinions about whether an
individual who has applied for title II or title XVI
disability benefits is "disabled" or "unable to work," or
make similar statements of opinions.  In addition, they
sometimes offer opinions in other work-related terms; for
example, about an individual's ability to do past relevant
work or any other type of work.  Because these are
administrative findings that may determine whether an
individual is disabled, they are reserved to the
Commissioner. Such opinions on these issues must not be
disregarded.  However, even when offered by a treating

                              31

source, they can never be entitled to controlling weight or given special significance.

* * * * *

Requirements for Recontacting Treating Sources

Because treating source evidence (including opinion evidence) is important, if the evidence does not support a treating source's opinion on any issue reserved to the Commissioner and the adjudicator cannot ascertain the basis of the opinion from the case record, the adjudicator must make "every reasonable effort" to recontact the source for clarification of the reasons for the opinion.

In Goff v. Barnhart, 421 F.3d 785 (8th Cir. 2005), the ALJ had discredited the opinion of two of the plaintiff's treating physicians on the ground that their opinions were contradicted by the plaintiff's daily activities and the doctors' own treatment notes. The plaintiff argued that the ALJ failed to satisfy his burden of developing the record. The Court of Appeals disagreed:

While the ALJ has an independent duty to develop the record in a social security disability hearing, the ALJ is not required "to seek additional clarifying statements from a treating physician unless a crucial issue is undeveloped." The Commissioner's regulations explain that contacting a treating physician is necessary only if the doctor's records are "inadequate for us to determine whether [the claimant is] disabled" such as "when the report from your medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. §§ 404.1512(e), 416.912(e). Here, the ALJ did not find the doctors' records inadequate, unclear, or incomplete, nor did it find the doctors used unacceptable clinical and laboratory techniques. Instead, the ALJ discounted the opinions because they were inconsistent with other substantial evidence. In such cases, an ALJ may discount an opinion without seeking clarification.

32

Id. at 791.

Here, as in Goff, the ALJ did not find Dr. Piepergerdes's records inadequate, unclear, or incomplete, nor did he find that Dr. Piepergerdes used unacceptable clinical or laboratory techniques. Instead, he discounted Dr. Piepergerdes's opinion because it was inconsistent with other substantial evidence. Dr. Piepergerdes's own treatment notes show that plaintiff's condition was fairly stable since he had not required any adjustment in medication or treatment. In his report, Dr. Piepergerdes indicated claimant had worked a series of full-time jobs that ended due to his memory problems and trouble getting along with people; however, plaintiff worked at one full time job for over 10 years as a warehouseman and quit because he did not get along with new people, and he worked at another warehouse job in 2004 from which he was laid off due to lack of work, not because he was unable to do the job. The ALJ noted that Dr. Piepergerdes's opinion was inconsistent with comprehensive neuropsychological testing results and with plaintiff's daily activities that included driving, working, maintaining a relationship with his girl friend, mowing the lawn, and occasional household chores.

Plaintiff cites Rosa v. Callahan, 168 F.3d 72 (2nd Cir. 1999), in support of his argument that the ALJ was required to

33

contact Dr. Piepergerdes. I find that case inapposite. In <u>Rosa</u>,
the ALJ rejected the opinion of a treating physician because the
treating physician's records "did not report findings of muscle
spasm to corroborate any loss of motion." The claimant did not
speak English and was represented not by an attorney, but by a
legal assistant. The claimant had testified that she saw her
treating physician every month for years, yet the records
included only nine visits with that doctor, with significant gaps
in the records. The record also included medical records from
another physician who specifically found that the claimant
suffered from spasms; however, the ALJ did not address that
finding in her report. The claimant testified that she was
treated at Bellevue Hospital and was x-rayed in the hospital
emergency room, but the record did not include any materials from
that visit. One doctor's notes included references to physical
therapy visits covering a significant amount of time; however,
the record before the ALJ did not include any records from a
physical therapist. Finally, records of two doctors reported
that the claimant had been treated by an orthopedic surgeon and
by a neurologist, but those records were not before the ALJ.

Under those circumstances, the Second Circuit held that the
ALJ erred in relying on the absence of a finding of muscle spasms
in determining that the claimant was not disabled. The court

34

additionally stated, "where there are no obvious gaps in the administrative record and where the ALJ already possesses a 'complete medical history,' the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim." <u>Id</u>. at 79 n. 5.

In this case, the ALJ did not deny plaintiff's claim based on a lack of evidence that could have been found in records which obviously existed but were not a part of the record. There simply is no factual similarity between this case and <u>Rosa</u>.

Based on all of the above, I find that the ALJ did not err in failing to contact Dr. Piepergerdes before finding plaintiff not disabled.[6]

## VII. STEP FOUR; BURDEN SHIFTING OF STEP FIVE

Next plaintiff argues that the ALJ erred in finding at step four that plaintiff could return to his past relevant work; and that in his alternative holding at step five, the ALJ erred in failing to acknowledge a shift in the burden of going forward with the evidence. Because the substantial evidence in the record as a whole supports the ALJ's finding at step five, I decline to address plaintiff's argument with regard to the ALJ's

---

[6]Plaintiff also takes exception to the ALJ characterizing Wellbutrin as a "mild psychotropic medication." This argument is irrelevant, as the main point is that plaintiff's symptoms were adequately controlled with medication as evidenced by the lack of medication adjustments.

finding at step four.

The law is clear that a denial of benefits will be reversed "where the ALJ fails to acknowledge the shift in burden to the Commissioner in determining if the claimant can perform a significant number of jobs in the national economy except in those cases in which the evidence is so strongly against the claimant that 'the outcome is clear regardless of who bears the burden of proof.'" Roberts v. Apfel, 222 F.3d 466, 471 (8th Cir. 2000) (quoting Butler v. Secretary of Health & Human Services, 850 F.2d 425, 426 (8th Cir. 1988); Pope v. Bowen, 886 F.2d 1038 (8th Cir. 1989).

In Pope v. Bowen, 886 F.2d 1038 (8th Cir. 1989), the ALJ found the claimant not disabled at step five of the sequential analysis without expressly recognizing the shift in burden. The Court of Appeals reversed, but the reversal was largely due to the ALJ's error in assessing the opinion of the claimant's treating physician:

> Upon examining the record before us, we cannot conclude that the evidence is so strongly against Pope's position that a proper allocation of the burden of proof would not have changed the outcome. Dr. Aronow, Pope's treating physician since 1983, found Pope to be totally disabled from any work. Dr. Toon, Pope's surgeon for the quadruple bypass surgery, referring to Pope's symptomatology, stated that Pope should be considered medically disabled. The ALJ found Dr. Aronow's opinions to contain inconsistencies primarily because of a treadmill stress test dated December 13, 1985 from which Dr. Aronow concluded that Pope had normal physical work capacity. In addition, the ALJ relied on the

36

findings of the Cardiac Surgery Associates in a letter dated
January 13, 1986 to hold that Pope was not disabled. . . .

The record contains other evidence, however, which minimizes
the effect of these inconsistencies.  The report from
Cardiac Surgery Associates which states that Pope was
walking over two miles per day without difficulty and with
no long term limitations imposed on his activities, although
dated January 13, 1986, was actually based on a June 10,
1985 examination.  In addition, this report specifically
referred the disability determination personnel to Dr.
Aronow, as Pope's personal physician, for more recent
evaluation of Pope's condition.  In a report dated December
11, 1985, Dr. Toon of the Cardiac Surgery Associates stated
that Pope had done well until two weeks earlier when Pope
again noticed the onset of angina pains and that Pope was
able to last only one minute on the treadmill.  He further
stated that the left anterior descending artery was heavily
diseased as it had been at the time of surgery.  Dr. Toon
recommended medical therapy and indicated that if therapy
was not successful, repeat surgery should be considered.

While Dr. Aronow expressed an opinion based on the December
13, 1985 treadmill test that Pope demonstrated a normal
physical work capacity, he also stated that the treadmill
test was inconclusive one day later, on December 14, 1985.
In his letter dated January 9, 1986, Dr. Aronow reported
that Pope had not had a good result from his bypass surgery,
continued to be very symptomatic in spite of medications,
and was at risk for myocardioinfarction [heart attack] in
the future.  Dr. Aronow stated that, considering Pope's age,
he would probably require a second bypass procedure in the
future, although it should be delayed as long as possible.
He also reported that Pope was experiencing angina with
minimal physical activity in spite of medications.  Dr.
Aronow concluded that he should be considered completely and
totally disabled for all types of work now and in the
future.

Under these circumstances, the ALJ's rationale for
discrediting Dr. Aronow's opinion is not based upon
substantial evidence on the record as a whole.  This state
of the record prevents us from concluding that the evidence
presented is so strongly against Pope's position that a
proper allocation of the burden of proof would not have
changed the outcome.  Accordingly, we must remand to the

Secretary for further consideration with a clear acceptance
of the burden shift. . . .

Finally, we observe that the testimony of the treating
physician, Dr. Aronow, must be accorded its proper weight
upon remand.  To reject the opinion of the treating
physician, the Secretary must establish that there is
substantial evidence on the record as a whole which leads to
such a result.

Therefore, because the treating physician's opinion was
improperly discredited, the Court of Appeals held that it could
not find that the evidence was "so strongly against the claimant
that the outcome is clear regardless of who bears the burden of
proof."

In Roberts v. Apfel, 222 F.3d 466, 471 (8th Cir. 2000), the
Court of Appeals restated the rule discussed in Pope, i.e., "We
will reverse where the ALJ fails to acknowledge the shift in
burden to the Commissioner in determining if the claimant can
perform a significant number of jobs in the national economy
except in those cases in which the evidence is so strongly
against the claimant that the outcome is clear regardless of who
bears the burden of proof."  Id. at 471 (internal quotations
omitted).  Unlike in Pope, the evidence in Roberts was so
strongly against the plaintiff that the outcome was clear
regardless of the ALJ's failure to address the shift in burden.
In Roberts, there was no error by the ALJ in assessing the
medical opinions as was the case in Pope.

38

I find that the facts of this case largely mirror those in Roberts. In this case, the ALJ discounted the opinion of Dr. Piepergerdes who stated that plaintiff was disabled. However, as discussed above, the substantial evidence in the record supports the ALJ's decision to discredit that opinion. There is no credible evidence in the record supporting a finding that plaintiff is disabled. Accordingly, any failure on the ALJ's part to acknowledge that the burden had shifted to the Commissioner is not grounds for reversal. See Roberts v. Apfel, 222 F.3d at 471.

## VIII. CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied. It is further

ORDERED that the decision of the Commissioner is affirmed.

/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
November 9, 2009